UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA DEAN,

               Plaintiff,                        Case Number 19-10210

v.                                                  Honorable David M. Lawson

UNITED STATES OF AMERICA,

               Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERTS, AND
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Christina Dean filed this case under the Federal Tort Claims Act to recover damages for injuries she says she sustained in an automobile accident with a federal employee. The government has moved to exclude the testimony of the physicians who treated her after the accident, who will testify about causation. Without the testimony linking the injuries to the accident, the government reasons, the plaintiff has no case and the government is entitled to summary judgment. The plaintiff moves for partial summary judgment on liability, contending that the government driver's failure to yield at an intersection controlled by a stop sign amounts to negligence as a matter of law. The motions are fully briefed and oral argument will not aid in their disposition. The plaintiff's treating physicians' opinions on causation plainly are admissible in evidence, and fact questions preclude summary judgment for either side at this stage of the case. Therefore, the Court will deny the motions.

I.  Facts

The basic circumstances of the automobile accident are undisputed. On August 18, 2016, United States Border Patrol Agent Kevin Brewer was driving his officially issued vehicle northbound through Port Huron Township on 15th Street and stopped at the intersection of Court

Street.  That intersection is controlled by stop signs for 15th Street in both directions, allowing drivers on Court Street the right-of-way.  Plaintiff Christina Dean was driving westbound on Court. After Brewer stopped at the stop sign, he proceeded into the intersection, where his vehicle was struck by Dean.  The police report of the accident noted that Brewer blamed "heavy fog" as the reason he did not see Dean's car approaching before proceeding and failing to yield.  The responding officer issued a warning to Brewer for failure to yield the right of way.

Beyond those basic facts, the parties' accounts diverge in some respects.

### A. Plaintiff's Story

Photographs at the scene on the morning of the accident show a light fog in the area, but the four corners of the intersection and the intersecting streets are visible for some distance from the photographer's position.  Dean testified that when the accident occurred, the "fog was lifting" and she could "see quite clearly" while driving.  She was able to see well past the accident intersection, at least the length of a football field.  The accident occurred after sunrise when it was light outside, and Dean clearly saw Brewer's vehicle as she approached the intersection.

Dean had the right of way as she approached the intersection with no stop or yield signal. Dean testified that she was traveling at or under the speed limit, which is 30 miles per hour at the location.  However, she first saw Brewer's vehicle just before the collision, as it emerged from behind a bush that obscured Dean's view of the stop sign on 15th Street, and she "slammed on her brakes" when she saw that a collision was imminent.  Brewer's vehicle already was in the intersection when Dean first spotted it, and the collision was unavoidable even though Brewer accelerated in an attempt to clear the right of way before Dean's car hit his.

Dean testified that the headlights on her car were automatic and would turn on and off by themselves based on the ambient light level, but she presumed that they were off when the accident happened because it was light out.

### B. Defendant's Story

Brewer was on his way to talk to a person about his immigration status when he was proceeding north on 15th Street and stopped at the stop sign at the Court Street intersection. After coming to a stop, Brewer says he looked left and right down Court Street and saw no other cars coming. However, as he proceeded into the intersection, Brewer saw Dean's car for the first time as it was "emerging from the fog" 20 to 30 feet away. Brewer accelerated, trying to clear the intersection, but it was too late, since he had only spotted Dean's car one or two seconds before the imminent collision. Brewer says that his vehicle was moving only 10-15 miles per hour when he first spotted Dean's car, but Dean was traveling, by Brewer's estimate, 35 miles per hour, and her headlights were off. Brewer attested that the fog depicted in crash scene photos was not as heavy as at the time of the accident, because it took the police 15 to 20 minutes to arrive, and the fog had "rapidly dissipated" during that time.

### C. Plaintiff's Injuries

The plaintiff's medical history following the accident is well documented. Although the defendant disputes the significance of some aspects of the treatment and the severity of the alleged impairments, the course of treatment that she received in the months and years following the accident is not in serious dispute.

An ambulance was called to the scene of the accident where it was noted that the plaintiff complained of right knee pain. She was transported to the hospital where doctors noted "paraspinal tenderness and spasms." She was prescribed Norco, Baclofen, Flexeril, and Fluoxetine. On August 22, 2016, plaintiff was seen by her family physician, Dr. Scott McPhilimy, who noted that

she had a limited range of lumbar motion and bruising on her right knee.  She also complained of headaches and stated that she had hit her head on the window during the vehicle impact.  On September 6, 2020, the plaintiff was seen by her neurosurgeon, Dr. Manouchehr Nikpour, who noted that she had right foot weakness, decreased lumbar strength and range of motion, and difficulty performing a tiptoe-heel walk.  Dean complained during that visit that she was unable to perform any of her usual daily activities and had limited mobility.

Dean continued to have "popping," "locking," and "giving way" in her right knee, and she was seen by an orthopedic surgeon in October 2016, who "noted tenderness to palpation of the medial joint line and pes bursa and positive Apley Compression and McMurray signs."  The orthopedic surgeon diagnosed Dean with bursitis and prescribed anti-inflammatory medication and corticosteroid injections for her back.  In October and November 2016, Dr. Nikpour performed three epidural blocks at L4-5, which resulted in only temporary relief from the back pain.  Dean also was prescribed physical therapy in February 2017, which was ineffective.  By March 2017, noting that the plaintiff "could not tolerate the pain," Dr. Nikpour recommended surgery.  In April 2017, he performed a decompressive laminectomy at L4-S1, foraminotomy and discectomy at L4-5, and fusion at L4-S1.  The surgery initially provided some relief from Dean's neck and back pain, but over the ensuing months Dr. Nikpour noted that Dean continued to have sciatic tenderness and could not sit or stand for very long.  She also had recurring and increasingly intolerable neck and back pain.  Eventually, in late 2019, Dr. Nikpour performed a second surgery with several disc fusions in Dean's cervical spine.

The plaintiff testified that she worked at the Saint Clair County Health Department before the accident, where her duties included checking patients in and out, performing lab tests, preparing billings, and assisting patients.  Immediately after the accident she missed one week of

work, and after the April 2017 surgery she was out of work to recover for six months.  She also missed three months of work after the 2019 neck surgery.  After the 2017 surgery, the plaintiff was prescribed 24-hour attendant care while recovering at home, and her daughter was required to help her with dressing, showering, changing bandages, household chores, and driving for around three months during the recovery.  After the accident, the plaintiff attested that she cannot go dancing or bowling as she used to, cannot attend concerts or any event where she has to stand for long periods of time, is unable to tolerate amusement park rides, and cannot lift or carry, or lie on the floor and wrestle with her grandchildren as she used to before the accident.  The plaintiff also testified that she cannot sit for more than an hour and has difficulty cooking and shopping because of her limited standing endurance and reduced lifting capacity.

### D. Procedural History

On January 22, 2019, the plaintiff filed her complaint pleading claims of negligence, owner liability, and *respondeat superior* liability under Michigan law via the Federal Tort Claims Act.

### II.  Defendant's Motion for Summary Judgment

The government contends that the plaintiff's medical experts' opinions are unreliable and must be excluded.  Without those opinions, the government reasons, the plaintiff cannot prove that her back and neck injuries were caused by the accident, and therefore the defendant is entitled to summary judgment as a matter of law.  The government offers other arguments to support its motion, but the main attack is directed to the plaintiff's medical experts, so that's where we will begin.

### A.  Medical Opinion Testimony

The plaintiff's treating neurosurgeon, Dr. Manouchehr Nikpour, had performed surgery on the plaintiff three years before the accident.  And he performed surgery following the accident in this case, basing his causation opinion on the longitudinal course of treating the plaintiff for several

years.  The government contends that Dr. Nikpour's opinion that the injuries he treated were caused by the accident must be excluded as unreliable because he admitted at his deposition that he was not aware of treatment the plaintiff received from her family practice doctor, Dr. Scott McPhilimy, in the interim between visit to Dr. Nikpour in July 2915 and the date of the accident. The government argues that Dr. McPhilimy's opinion must be excluded because he is unqualified to opine on the cause of neurological issues since he is a family practitioner and not a neurosurgeon, and he did not provide a fulsome report of his testimony as contemplated by Federal Rule of Civil Procedure 26(a)(2)(B).

The parties do not contest the applicable law.  "Expert" testimony consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror."  *See United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016); Fed. R. Evid. 702.  Such testimony is governed by Evidence Rule 702, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge.  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

The language added by the 2000 amendment — subparagraphs (b) through (d) — restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

An expert's opinion is not relevant unless it is based on the actual facts of the case. *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 529 (6th Cir. 2014) (Keith, J. dissenting) ("The "relevancy" prong of Rule 702 requires that an expert's theory adequately 'fit' the facts of the case. Expert testimony that does not fit the facts does not relate to an issue in the case and, therefore, is not relevant.") (citing *Daubert*, 509 U.S. at 591). An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results.

## 1. Dr. Nikpour

The defendant does not challenge the adequacy of the disclosures by the plaintiff's treating physician, Dr. Manouchehr Nikpour, or his qualifications generally to opine on the medical causation of neurological symptoms. The summary report states that he is board certified in neurological surgery and trained in the diagnosis of patients. Dr. Nikpour further stated that his opinions were based on a review of Dean's medical records and his clinical observations from treating her.

Dr. Nikpour treated Dean various times over the years from 2013 through 2019. In 2013, he operated on her back to treat a herniated disc and performed a surgical fusion with pedicular screws. After the surgery, Dr. Nikpour reported that Dean "did very well and did not have any

problems."  An MRI on July 21, 2015 "did not show any particular problem," but he noted that she still was "complaining of some neck and shoulder pain."

Dr. Nikpour did not see Dean again until September 6, 2016, about three weeks after the accident, when she came to his office "complain[ing] of severe back pain."  He also noted that she was "suffering terrible back and leg pain."  During that visit, Nikpour observed that the plaintiff was "unable to perform tiptoe heel walk."  Dr. Nikpour ordered an MRI, which was performed on September 7, 2016, and "revealed postoperative changes at L5-S1, small central disc protrusion and annular tear at L5-S1 which indents the ventral thecal sac."  The MRI also revealed a "small foraminal annular tear" and "disc bulges abutting the inferior and anterior nerve roots at L4-5."

Dr. Nikpour initially prescribed conservative treatment with medication, epidural blocks, and physical therapy, which did not resolve the pain.  In April 2017, Dr. Nikpour decided to perform surgery and discovered loosened screws which had been placed during the 2013 procedure, along with several disc herniations, which he surgically removed.  He opined that the loosening of the screws and aggravation of the underlying neck and back conditions were caused by injuries sustained in the accident.  Dean recovered well after the surgery but required time off work and 24-hour attendant care during her recuperation.  In a supplemental report, Dr. Nikpour stated that Dean had "developed severe neck pain and headaches" in the Spring of 2019, which he treated with further surgery to perform a C2-C7 fusion.  Dean recovered "very well" after the surgery in June 2019, and her headaches "improved a great deal," but she required physical therapy and did not return to work at least through early September 2019.

Dr. Nikpour conceded at his deposition that he did not know that Dr. McPhilimy, the plaintiff's family doctor, had treated her for neck and back pain and prescribed medication and a TENS device during 2016, in the 13-month window between her last treatment with Dr. Nikpour

and the date of the accident.  He also conceded that he could not remember if he compared pre- and post-accident MRI imaging studies to determine any differences in Dean's spinal and cervical condition or the status of surgically embedded hardware.  *Id.* at PageID.613.

Without question, Dr. Nikpour is qualified to opine on the cause, diagnosis, treatment, and prognosis of neurological injuries, and the defendant does not suggest otherwise.  And the defendant has not established that the opinion is unreliable due to lack of a sufficient factual basis.

Of course, it is well settled that "an expert's opinion must be based on the actual facts of the case." *Sanford v. Russell*, 387 F. Supp. 3d 774, 780 (E.D. Mich. 2019) (citing *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 529 (6th Cir. 2014) (Keith, J. dissenting) ("The 'relevancy' prong of Rule 702 requires that an expert's theory adequately 'fit' the facts of the case. Expert testimony that does not fit the facts does not relate to an issue in the case and, therefore, is not relevant.")). The unfounded reliance on an absence of evidence of neurological problems could render an opinion unreliable if the expert refused to acknowledge undisputed evidence that such problems actually were treated during the relevant time frame.  But that is not what the medical records in this case disclose.  Instead, Dr. McPhilimy's records and report confirm — rather than refute — the premise of Dr. Nikpour's causal conclusion, where he observed that the plaintiff was "stable" and had no neurological issues while under Dr. McPhilimy's care from 2015 through the accident date.  Moreover, an expert may rely on and incorporate into the basis of his opinion information that is produced at any time, including information that he learns even for the first time at trial. *Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1108-09 (8th Cir. 2014).  The opinion is not rendered excludible merely because it may be revised based on facts that the expert learned about after preparing his report.  Dr. Nikpour certainly now is aware of Dr. McPhilimy's treatment, even

if he was not before, and he can be cross-examined on the basis of his opinion as it pertains to all of the medical records.

The defendant has not shown that Dr. Nikpour's opinion was ungrounded in the actual facts of the case. The defendant quibbles with numerous details of the clinical observations in the medical record. Its position that the plaintiff's experts' opinions are unfounded because they disagreed with the defendant's experts who reviewed the same records are, of course, appropriate fodder for cross-examination, but are not grounds for exclusion of the testimony. An expert's testimony is not rendered unreliable by opposing expert testimony that contradicts it, because contradictory fact or opinion evidence merely establishes a fact dispute. *See Daubert*, 509 U.S. at 595 (noting that such matters are best reserved for "[v]igorous cross-examination" and "presentation of contrary evidence" to the jury").

### 2. Dr. McPhilimy

The defendant asks the Court to exclude Dr. McPhilimy's opinion because he did not produce a full report as required by Rule 26(b)(2)(B) for a specially retained expert, and because as a family practitioner it insists that he is unqualified to opine on the causation of neurological symptoms. Both arguments fail.

Dr. McPhilimy is a board-certified family medicine physician. Christina Dean was his patient from 2009 through 2019. His summary report noted the surgical history recited above, all of which undisputedly was handled by Dr. Nikpour. Dr. McPhilimy reported that, during his treatment of Dean after the 2013 surgeries, she was "stable," although she "continued to use pain medication and muscle relaxers on an as-needed basis." However, after the August 18, 2016 car accident, Dr. McPhilimy saw Dean on August 22, 2016, when she presented with "complaint[s] of headache, shoulder pain, neck pain, low back pain, and knee pain." After reciting the post-

accident observations and several courses of surgery prescribed by Dr. Nikpour, Dr. McPhilimy stated that in his opinion the accident aggravated Dean's underlying spinal and cervical degenerative disc disease, because the condition of her neck and back had been "stable" before the accident.

It is evident from the record and Dr. McPhilimy's report that he was the plaintiff's primary medical treater from at least 2016 through 2019. He based his opinions on his first-hand, direct involvement in her treatment for various symptoms, which were recorded in his clinical notes, and for which he prescribed various treatments.

Dr. McPhilimy did not prepare and sign a report containing all the elements listed in Rule 24(a)(2)(B). But the rigorous disclosure obligations of that rule only apply to witnesses who will "present evidence under Federal Rule of Evidence 702, 203, or 705" and who were "retained or specially employed to provide expert testimony in the case." *Ibid.* A long line of cases has affirmed the general principle that a "treating physician" is not required to produce a formal report under Rule 26(a)(2)(B). In *Fielden v. CSX Transportation, Inc.*, 482 F.3d 866 (6th Cir. 2007), for example, the court held that an expert witness report "is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden v. CSX Transp., Inc.,* 482 F.3d 866, 871 (6th Cir. 2007). Opinions on the cause of an injury can fall within that "core," although at times it may range beyond. *Id.* at 869-70 ("[D]octors may need to determine the cause of an injury in order to treat it. Determining causation may therefore be an integral part of 'treating' a patient."). The relevant factors to consider are whether: (1) the physician reached his conclusion at the time of treatment; (2) the opposing party would be surprised by the testimony; (3) the condition leaves room for debate as to the specific ailment and

its sources; (4) the physician relied upon ordinary medical training in drawing his conclusion; and (5) the physician will rely on tests, documents, books, videos, or other sources not relied upon during treatment. *Id.* at 871–72; *see also Gaspar v. Dicks*, No. 08-13707, 2011 WL 5975061, at *4 (E.D. Mich. Nov. 29, 2011).

Here, Dr. McPhilimy formed his opinion as a natural result of personal involvement in the plaintiff's pre- and post-accident treatment. His opinion "naturally flows from [his] care and treatment of the patient," obviating the need for a report under Rule 26(a)(2)(B). *Nelson v. Sims*, No. 19-1047, 2020 WL 2616512, at *3 (W.D. Tenn. May 22, 2020) (quotation marks and citations omitted). He was not asked to render an analysis of facts supplied by others instead of his own personal observations. His opinion easily fits the "treating physician" mold. "When an expert's, such as a treating physician's, 'opinion about causation is premised on personal knowledge and observations made in the course of treatment, no report is required under the terms of Rule 26(a)(2)(B).'" *Deere & Co. v. FIMCO Inc.*, 239 F. Supp. 3d 964, 980 (W.D. Ky. 2017) (quoting *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 7 (1st Cir. 2011)). Although Dr. McPhilimy recited his awareness of the plaintiff's prior surgical history in his report, it is clear that his opinion about causation was based principally on his direct observations and treatment of her while she was under his care over the course of a decade, including before and after earlier treatment by Dr. Nikpour. And Dr. McPhilimy did not opine on any aspects of the prior surgery in which he did not participate; instead, he limited the basis of his conclusions to his own observations that her condition was "stable" and that she had no neurological complaints in the time that he treated her.

Dr. McPhilimy also is qualified to render an opinion on causation. His lack of training in neurological surgery or related fields is not an obstacle to admission of his medical opinion that

was based on general principles of diagnosis and treatment of conditions within his usual practice. The government's criticism of Dr. McPhilimy's lack of particular specialized training does not impair the admissibility of his testimony, because he is qualified by his extensive general experience and training as a doctor to apply diagnostic principles that, based on his clinical experience and medical training, are accepted in his field.  *See Zuzula v. ABB Power T&D Co.*, 267 F. Supp. 2d 703, 714 (E.D. Mich. 2003).  Here, it does not take any specialized medical training for Dr. McPhilimy to opine on his theory that the stability of the plaintiff's condition and absence of neurological complaints before the accident, and the immediate surfacing of such complaints following an accident injury, led him to conclude that the medically probable cause of the ensuing neurological complaints was an injury due to the accident. *Banister v. Burton*, 636 F.3d 828, 832 (7th Cir. 2011) ("Dr. Fishman, a trauma doctor, testified as to the physical abilities of Banister at the time he treated him. As the judge held, this type of knowledge is standard to all doctors, and Dr. Fishman was qualified to testify."); *Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010) ("Dr. Weinstein's second conclusion, that Taylor's vomiting combined with her diuretic medications may have contributed to her tachycardia and subsequent death, should not have been excluded. The effects of vomiting on potassium and electrolyte levels in the body is not specialized knowledge held only by cardiologists, and as Dr. Weinstein opined, it is knowledge that any competent physician would typically possess."); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1349-50 (N.D. Fla. 2018) ("Considering Dr. Glenmullen's extensive experience in the field of psychiatry, his knowledge of the relevant scientific principles and methods, and the liberal standard for admission of expert testimony under Rule 702, the Court finds him qualified to offer his general causation opinion (encompassing biological plausibility, epidemiology/biostatistics, toxicology, and pathological gambling) in this case. Objections to the

level of his expertise go to the credibility and weight of his opinion, not its admissibility.") (citations, quotations, and footnotes omitted).  Criticism of his lack of specialized training on any particular topic is an appropriate subject for cross-examination, but it is not a basis to exclude the testimony.

Moreover, it is evident from the record that the treatment of patients having the plaintiff's alleged symptoms and diagnoses is within Dr. McPhilimy's area of practice as a family doctor, and he is therefore qualified to testify as to his medical opinions formed on the basis of his own observations made during the course of treatment.  *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("Dr. Ruge stated that he routinely cared for patients who have seizures as part of their neurosurgical condition, witnessed numerous seizures himself, and operated on individuals with head injuries comparable to Weekley's. So Dr. Ruge possessed the requisite qualifications to testify about seizures.").

\* \* \* \* \* \* \* \* \*

The testimony of the plaintiff's medical witnesses is admissible and sufficient to establish a fact question on both the cause in fact and the proximate cause of the plaintiff's injuries.  *Johnson v. Vanderkooi*, 502 Mich. 751, 768, 918 N.W.2d 785, 794 (2018).  The plaintiff "'need not prove that an act or omission was the *sole* catalyst for his injuries.'"  *Estate of Taylor by Taylor v. Univ. Physician Group*, 329 Mich. App. 268, 941 N.W.2d 672, 677 (2019) (quoting *Craig v. Oakwood Hosp.*, 471 Mich. 67, 87, 684 N.W.2d 296, 309 (2004)).  Instead, she "'must introduce evidence permitting the jury to conclude that the act or omission was *a* cause.'"  *Ibid.*  The testimony satisfies that requirement as well as showing that "the actual cause . . . created a foreseeable risk of the injury the plaintiff suffered."  *Ibid.*

B.  Other Grounds for Summary Judgment

In addition to its arguments that the plaintiff's case fails for want of a causation expert, the government argues that the plaintiff did not suffer an injury that meets the threshold required to recover damages from a third-party tortfeasor.

The plaintiff brought her claim under the Federal Tort Claims Act.  The United States' liability under the FTCA is determined by reference to state law.  *Brown v. United States*, 583 F.3d 916, 919-20 (6th Cir. 2009).  In this case, the governing law is Michigan's No-Fault Insurance Act, Mich. Comp. Laws §§ 500.3101, *et seq.*

Under that law, "tort liability for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle is limited to a list of enumerated circumstances." *McCormick v. Carrier*, 487 Mich. 180, 189, 795 N.W.2d 517, 523 (2010) (citing Mich. Comp. Laws § 500.3135(3)).  Individuals "remain[] subject to tort liability for noneconomic loss caused by [their] ownership, maintenance, or use of a motor vehicle," but only "if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement."  Mich. Comp. Laws § 500.3135(1).

The first qualifier, "serious impairment of body function," is defined to mean "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life."  Mich. Comp. Laws § 500.3135(5).  That requires proof of "'(1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living).'"  *Piccione v. Gillette*, 327 Mich. App. 16, 20, 932 N.W.2d 197, 200 (2019) (quoting

*McCormick*, 487 Mich. at 215, 795 N.W.2d at 537).  There is no prescribed elemental formula.
The determination is "inherently fact- and circumstance-specific and the analysis must be
conducted on a case-by-case basis." *Ibid.* (citations and quotations omitted).

The term "permanent serious disfigurement" is not further defined by the statute, but
Michigan courts straightforwardly have construed it to mean that "in order to meet the
disfigurement threshold, a plaintiff must have a disfigurement that is both permanent and serious."
*Fisher v. Blankenship*, 286 Mich. App. 54, 66, 777 N.W.2d 469, 478 (2009).  "To disfigure
something is to mar the appearance or beauty of,' to 'deform,' or to 'deface.'" *Ibid.*  "Hence, with
regard to a person, a disfigurement is something that mars, deforms, or defaces the person's
appearance. Further, the disfigurement is permanent if it will exist perpetually or is otherwise
'long-lasting,' and will be considered serious if it is 'significant' or 'not trifling.' Thus, a threshold
disfigurement is a long-lasting and significant change that mars or deforms the injured person's
appearance." *Ibid.*  That determination must me made case by case as well.

All of that must be assessed against the backdrop of the summary judgment standard under
Rule 56(a) (allowing summary judgment only "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law").  Applying that
standard, the court views the evidence and draws all reasonable inferences in favor of the non-
moving party, and determines "whether the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The defendant has pointed to evidence suggesting that the plaintiff's manner of living was
not as dramatically affected as she has alleged.  But her testimony is sufficient to suggest that
important aspects of her daily life were compromised by the neurological damage that allegedly

was caused by the accident injury, and the determination of how significant the impact of the compromise was on her customary manner of living is an inherently fact-intensive determination that must be left to the factfinder.  As the Michigan Court of Appeals has explained, this is a complex and subjective determination not amenable to decision as a matter of law.  *Piccione*, 327 Mich. App. at 20-21, 932 N.W.2d at 200 (noting that "the statute merely requires that a person's general ability to lead his or her normal life has been affected, not destroyed," and that "there is no express temporal requirement as to how long an impairment must last in order to have an effect on the person's general ability to live his or her normal life").

The plaintiff here has produced ample medical documentation and testimony to support her contention that her lifestyle was abridged in significant ways by her accident injuries and ensuing surgical treatment and recovery, which included at least six months of missed work as a result of the first surgery.  She also attested that she no longer is able to perform many significant life activities such as dancing, bowling, attending concerts and other events, playing with her grandchildren, and doing normal household chores like cooking and shopping.  The defendant points to certain indications of ongoing lifestyle, which it says belie the plaintiff's representations about the significance of her injuries.  But those are merely instances to be considered as part of the totality of the circumstances, which the factfinder must weigh altogether to determine whether on balance the plaintiff's normal life activities after the accident were limited materially by any injuries she suffered that were caused by the accident.

In any event, there is sufficient evidence on all the elements of the plaintiff's claim to preclude summary judgment for the government.

III.  Plaintiff's Motion for Partial Summary Judgment

Dean argues that she is entitled to judgment as a matter of law on liability because the record establishes beyond question that Agent Brewer was negligent by failing to yield the right of way.  She also argues that she was not comparatively negligent in the operation of her car, because she had the right of way and it was not incumbent upon her to anticipate Brewer's negligent failure to yield.  And she says that she has established injuries beyond the no-fault threshold because she required surgery and her ability to work and perform basic household tasks was impaired, and she also has a permanent scar from neck surgery that was required to address her cervical issues due to the accident trauma.  Dean contends that the opinions of her treating doctors establish that the accident aggravated pre-existing conditions in her knee, back, and neck, which had been largely or completely resolved prior to the accident, and for which she had received no treatment except for some ongoing "aches and pains."

The defendant does not challenge the plaintiff's *prima facie* case of negligence; with good reason, for it is well settled that proof of a driver's failure to yield the right of way while crossing an unimpeded thoroughfare from a controlled side street is sufficient to demonstrate negligent operation of his vehicle.  *Churukian v. La Gest*, 357 Mich. 173, 180, 97 N.W.2d 832, 836 (1959). "In Michigan, a violation of a penal statute such as MCL 257.649(8), which requires drivers to stop at a stop sign, creates a rebuttable presumption of negligence unless legally excused." *Headworth v. Kemp*, No. 345088, 2020 WL 1968259, at *2 (Mich. Ct. App. Apr. 23, 2020) (citing *Zeni v. Anderson*, 397 Mich. 117, 136; 243 N.W.2d 270 (1976)).  "If the presumption is not rebutted, a plaintiff is entitled to a directed verdict on the issue of a defendant's negligence." *Ibid.* (citing *Isabella County Dept. of Social Services v. Thompson*, 210 Mich. App. 612, 615; 534 N.W.2d 132 (1995)).  Moreover, there is evidence from which the jury reasonably could conclude,

contrary to defendant's testimony, that his vision was not impeded by atmospheric conditions and that his unawareness of oncoming traffic was due either to his failure to look both ways or an incautiously rapid incursion to the intersection.

The defendant contends, however, that the plaintiff overlooks the defendant's testimony, which would support a jury finding that the plaintiff was comparatively negligent because she was driving faster than the speed limit, with her headlights off, in heavy fog that limited visibility to no more than 20-30 feet. Agent Brewer's testimony that he could estimate the speed of Dean's vehicle at 35 miles per hour is remarkable, in that he only first saw it 20 to 30 feet away (at 35 mph, he would have had it in view for less that one second). That aside, it is plausible that a factfinder could conclude that even if Brewer had behaved as prudently as possible under the conditions, he could not reasonably have seen or avoided the plaintiff's rapid approach as he emerged for an otherwise apparently safe crossing of the intersection. There is a genuine factual dispute in play over whether the plaintiff was driving above the posted speed limit or too fast for the prevailing conditions, and, in addition, failed to take precautionary measures to improve the visibility of her car to other drivers.

"Michigan is (mostly) a pure comparative negligence jurisdiction." *Blackwell v. Franchi*, 502 Mich. 918, 914 N.W.2d 900, 903 (2018) (McCormack, J., concurring). Although "a plaintiff's negligence [may] not be used as a basis to dismiss a suit altogether," recovery of noneconomic damages — compensation for pain and suffering, emotional distress, or loss of enjoyment — "are barred whenever the plaintiff is more at fault than anyone else." *Id.* at 918 n.2, 914 N.W.2d 903 n.2 (citing Mich. Comp. Laws § 600.2959). If the factfinder finds credible Brewer's portrayal of the accident circumstances, then it would have a valid evidentiary foundation for a finding that the plaintiff was comparatively negligent, and perhaps to conclude that she was at least 51% at fault

in causing the collision.  *See*, *Howard v. Wistinghausen*, No. 345788, 2020 WL 402056, at *8 (Mich. Ct. App. Jan. 23, 2020).  Therefore, Dean is not entitled to a judgment in her favor on liability as a matter of law.

On the injury threshold issue, the defendant has raised sufficient questions of fact based on information it uncovered about the plaintiff's post-accident conduct such as going car shopping two days after the accident, and her apparent participation in other vigorous life activities despite her purported incapacity, to preclude affirmative judgment as a matter of law on the impairment element of the plaintiff's claim.

As the plaintiff points out, to make out a viable claim under the No-Fault Act she need only demonstrate either that she suffered a significant impairment of bodily function *or* that she was permanently disfigured.  But because the surgical scar on her neck, which she allegers is a permanent disfigurement, was not the direct result of any accident injury, but instead was the outcome of a surgery performed more than three years after the incident, there is at least a significant question of fact whether the scar was proximately caused by any accident injury, and whether the 2019 surgical intervention was instigated by the continued progress of her previously diagnosed degenerative spinal and cervical conditions.

These factual disputes preclude summary judgment for the plaintiff.

## IV.  Conclusion

The testimony of the plaintiff's treating doctors is admissible; their opinions on causation furnish sufficient proof to establish that element of the plaintiff's claim.  Disputed issues of fact on material points of the claims and defenses prevent summary judgment for either the plaintiff or the defendant.

Accordingly, it is **ORDERED** that the motions for summary judgment (ECF Nos. 10, 20)

are **DENIED**.

s/David M. Lawson

DAVID M. LAWSON
United States District Judge

Dated:   June 22, 2020